**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

TERRELL N. DREW, individually,

        Plaintiff,

                                    Case No. 3:17-cv-991-J-34JBT

v.

JESSICA N. SHOUSE, individually, and
MIKE WILLIAMS, in his official capacity
as Sheriff of Duval County, Florida,

        Defendants.
_____/

## O R D E R

**THIS CAUSE** is before the Court on Defendant Jessica N. Shouse's Motion to Dismiss Amended Complaint and Supporting Memorandum of Law (Doc. 19, Shouse Motion), and Defendant Mike Williams' Motion to Dismiss Amended Complaint and Supporting Memorandum of Law (Doc. 20, City Motion), both filed on December 4, 2017. In the motions, the Defendants request that the Court dismiss Plaintiff Terrell N. Drew's Amended Complaint in which Drew asserts false arrest claims against Shouse and Williams for violation of his rights under the Fourth and Fourteenth Amendments. See Doc. 17, Amended Complaint and Demand for Jury Trial (Amended Complaint), filed November 21, 2017. Drew opposes the Defendants' motions. See Plaintiff's Response in Opposition to Defendants' Motions to Dismiss (Doc. 21, Plaintiff's Response), filed December 18, 2017. Accordingly, the motions are ripe for review.

## I.    STANDARD OF REVIEW

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n 1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  In addition, all reasonable inferences should be drawn in favor of the plaintiff.  See Omar ex. rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir. 2003) (per curiam).  Nonetheless, the plaintiff must still meet some minimal pleading requirements.  Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262–63 (11th Cir. 2004) (citations omitted).  Indeed, while "[s]pecific facts are not necessary," the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

Notably, in considering a motion to dismiss pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure (Rule(s)), "the court ordinarily may not look beyond the pleadings." Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co., No. 6:14-cv-6016-Orl-31TBS, 2016 WL 3144103, at *1 (M.D. Fla. June 6, 2016) (citations omitted).  However, the Court may consider documents and exhibits attached to the Plaintiff's complaint where those attachments are undisputed in their authenticity and central to

the Plaintiff's claims. See Arthur v. Thomas, 674 F.3d 1257, 1265 (11th Cir. 2012) (collecting cases). See also Ferguson v. Dunn, No. 1:16-v-00272, 2018 WL 2656990, *1 n.1 (E.D. Tex. April 27, 2018) (video disc attached to complaint considered part of plaintiff's pleadings); Gersbacher v. City of New York, 134 F. Supp. 3d 711, 720 (S.D. N.Y. 2015) (video evidence considered in context of 12(b)(6) motion where "video has either been offered by the plaintiff as part of its pleadings or the plaintiff has incorporated the video by reference after the defendant introduced the video"); Gordon v. Invisible Children, Inc., No. 14 Civ. 4122(PGG), 2015 WL 5671919, *1 n.1 (S.D. N.Y. Sept. 24, 2015) (video attached to complaint considered by court in context of 12(b)(6) motion).

Additionally, the "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted); see also BellSouth Telecomm., 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (citations and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 679. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

## II.    BACKGROUND[1]

On or about August 24, 2013, Drew hosted a party at his residence in Jacksonville, Florida. Amended Complaint at ¶ 9. During the party, Drew asked Timothy R. Davis, one of the party guests, to leave because Davis allegedly had been physically inappropriate with Drew's fiancé and had acted in a physically aggressive manner toward Drew. Id. at ¶ 10. Davis left Drew's home, but returned within a few minutes, at which time, Drew again told Davis he had to leave and escorted Davis out of the front door of Drew's home. Id. at ¶ 11. Davis "then became irate and physically aggressive, making physical contact with . . . female party guests who were attempting to calm" him. Id. at ¶ 13. Then,

> [w]ithout warning or provocation, . . . Davis began to physically, repeatedly and forcefully strike [Drew] with closed fists [on] his face and body. . . . Davis also began to pin [Drew] into a corner between a wall and the front door of [Drew's] home. At all times material, . . . Davis was substantially taller, heavier and stronger than [Drew] . . . . Fearing imminent death or great bodily harm, [Drew] reasonably believed that using or threatening to use deadly force was necessary to prevent such imminent death or great bodily harm . . . . [Drew] then pulled a gun he had been possessing in a side-holster and fired one (1) shot into Mr. Davis' face.

Id. at ¶ ¶ 14-15, 18-19.

The facts alleged in Drew's Amended Complaint are supplemented by a video recording which captured the minutes prior to, during, and after the shooting incident. See Amended Complaint at ¶ 28, Exhibit A.[2] The video recording, while lacking audio, shows Davis, wearing a striped shirt, leaving the party from Drew's front porch at the 3:21

---

[1] In considering the Motion, the Court must accept all factual allegations in the Amended Complaint as true, consider the allegations in the light most favorable to the Plaintiff, and accept all reasonable inferences that can be drawn from such allegations. Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from Drew's Amended Complaint, and may well differ from those that ultimately can be proved.

[2] Neither party has disputed the authenticity of the recording, and the events depicted in the recording are central to Drew's claims. Accordingly, the Court may view the recording in the course of evaluating the sufficiency of Drew's pleadings. See Arthur, 674 F.3d at 1265. See also Ferguson, 2018 WL 2656990 at *1 n.1; Gersbacher, 134 F. Supp. 3d at 720; Gordon, 2015 WL 5671919 at *1 n.1.

minute mark, after spending a period of time on the front porch in a seemingly agitated conversation with female party guests. Then, about three and a half minutes later, at the 7:03 minute mark of the recording, Davis again exits the front door of Drew's house, this time being accompanied by Drew, who was wearing a cowboy hat.[3] For the next thirty-two seconds, the men engage in what appears to be a progressively adversarial conversation. Then, at the 7:35 minute mark of the recording, Davis punches Drew in the head and face eight times in rapid succession. As Davis punches Drew, Drew assumes a crouched and defensive position, and four seconds into the assault, at the 7:39 minute mark of the video, reaches for his gun. While Davis is still striking Drew, another party guest exits the home at the 7:40 minute mark of the recording, and seeks to restrain Davis. In the second or so that it takes the party guest to pull Davis away from Drew, Drew assumes an upright position and fires a shot at Davis, hitting him in the face.

Soon after the incident, emergency personnel arrived at Drew's home and transported Davis to a local hospital where he received medical care. Id. at ¶ 22. Shouse, a detective for the Jacksonville Sheriff's Office, id. at ¶ 5, then arrived at the scene. Id. at ¶¶ 22-23. There, she "surveyed [Drew's] home and made contact with several witnesses." Id. at ¶ 23. At that time, Drew and "several others present told . . . Shouse that . . . Drew had acted in self-defense." Id. at ¶ 25. Nonetheless, Shouse detained Drew and transported him to the police station. Id. at ¶ 24. There, while being questioned by Shouse, Drew again explained that "he had shot . . . Davis in self-defense to protect himself from . . . Davis' violent attack." Id. at 26. Drew also informed Shouse that he had

---

[3] While it is not detailed in the Amended Complaint, nor otherwise explained by viewing the video, it appears that Davis regained access to Drew's property by some means other than coming onto the front porch and through Drew's front door.

a video surveillance system at his home that "captured the entire incident." Id. at ¶ 27. While still keeping Drew detained at the police station, Shouse "retrieved and viewed the video recording." Id. at ¶ 28. After reviewing the video recording, Shouse arrested Drew, without a warrant, for attempted murder. Id. at ¶ 31. After his arrest, Drew paid for a $50,003.00 surety bond. Id. at ¶ 33. Ultimately, the State Attorney's Office "did not file an information against [Drew] for attempted murder," although Drew's criminal case remained open for six months, from August 2013 to March 2014. Id. at ¶ 35.

Prior to the events in this case, in 2005, the State of Florida enacted Florida Statutes section 776.032, which extends immunity from arrest, detention, and prosecution, to individuals who used force to defend themselves or their homes. See Fla. Stat. § 766.032(1). The law directs that law enforcement should "not arrest [a] person for using or threatening to use deadly force unless [law enforcement] determines that there was probable cause that the force that was used or threatened was unlawful." Id. at § 766.032(2).[4] Drew alleges that despite "enactment of section 766.032, the Jacksonville

---

[4] More specifically, the law commands that:

> (1) A person who uses or threatens to use force as permitted in s. 776.012, s. 776.013, or s. 776.031 is justified in such conduct and is immune from criminal prosecution and civil action for the use or threatened use of such force by the person, personal representative, or heirs of the person against whom the force was used or threatened, unless the person against whom force was used or threatened is a law enforcement officer, as defined in s. 943.10(14), who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law or the person using or threatening to use force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, the term "criminal prosecution" includes arresting, detaining in custody, and charging or prosecuting the defendant.
>
> (2) A law enforcement agency may use standard procedures for investigating the use or threatened use of force as described in subsection (1), but the agency may not arrest the person for using or threatening to use force unless it determines that there is probable cause that the force that was used or threatened was unlawful.

Fla. Stat. Ann. § 776.032. Likewise, the Florida statutes further direct that

> (1) A person is justified in using or threatening to use force, except deadly force, against another when and to the extent that the person reasonably believes that such conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force. A person who uses or threatens to use force in accordance with this subsection does not have a duty to retreat before using or threatening to use such force.

Sheriff's Office has failed to change their policies, procedures, and general orders with respect to the use of force investigations." Amended Complaint at ¶ 49. Moreover, he asserts that

> [t]o date, the Jacksonville Sheriff's Office [JSO], led by Mike Williams, permits its law enforcement officers to effect arrests of suspects without first establishing probable cause to believe that a use of force was not justified [under Florida law.] In the twelve years since Section 766.032 was enacted, the only document concerning Section 766.032 that was authored and distributed to JSO employees was a "Bulletin" that merely quoted the language of the statute. Otherwise, the JSO has not trained, educated, or instructed its law enforcement officers, including . . . Shouse, about their affirmative duty under Section 776.032. The JSO's policies, protocols, and general orders, which permit arrests in violation of Section 776.032, were the moving force and true cause of [Drew's] arrest without probable cause.

Id. at ¶ 50-53.

In his Amended Complaint, Drew brings an action under 42 U.S.C. § 1983 against Shouse individually, and Williams, in his official capacity as Sheriff of Duval County, Florida. Id. at 1.[5] In Count I, Drew alleges that Shouse violated his Fourth and Fourteenth Amendment rights by arresting him without a warrant for attempted murder, where Drew asserted his shooting of Davis was justified pursuant to Florida Statutes section 766.032. Id. at 6-7. In Count II, Drew alleges that Williams, as Sheriff of Duval County, failed to change JSO policies, procedures, and general orders to conform with section 766.032,

---

(2) A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony. A person who uses or threatens to use deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use the deadly force is not engaged in a criminal activity and is in a place where he or she has a right to be.

Id. at § 776.012.

[5] A suit against an individual in his official capacity is "to be treated as a suit against the entity" the individual represents. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1060 (11th Cir. 1992). Here, Sheriff Williams represents the City of Jacksonville, and therefore the Court will refer to both interchangeably, as context requires.

and likewise failed to properly train its officers regarding the same. Accordingly, Williams, on behalf of the Sheriff's Office and the City of Jacksonville, was the "direct and proximate cause" of Drew's Fourth Amendment rights violation. Id. at ¶ 55. Drew seeks a jury trial and damages. Both Shouse and Williams filed motions to dismiss Drew's Amended Complaint.

## III. ARGUMENTS OF THE PARTIES

In the Shouse Motion, Shouse argues that the facts alleged in Drew's Amended Complaint, coupled with the attached video recording of the incident, establish that Shouse had probable cause to conclude that Drew's shooting of Davis was unlawful, and therefore Shouse did not arrest Drew in violation of his constitutional rights. Shouse Motion at 4-5. More specifically, Shouse contends that she is entitled to qualified immunity because she had arguable probable cause to arrest Drew. Id. at 7-13. As such, she asks that the claim against her be dismissed.

In response, Drew asserts that the facts alleged in his Amended Complaint along with the attached video of the shooting make clear that Drew was acting in self-defense and well within the immunity provided to him by Florida law. Plaintiff's Response at 6-7. Drew therefore contends that Shouse cannot establish she had probable cause, arguable or otherwise, to arrest him for attempted murder. Id. at 7-9. Accordingly, Drew contends that Shouse cannot invoke qualified immunity as a protection from litigation, and his claim against her should not be dismissed. Id. at 9-13.

In the City Motion, the City argues that the facts alleged in Drew's Amended Complaint do not sufficiently state a claim of municipal liability. City Motion at 1. First, the City asserts that Shouse had probable cause to arrest Drew, and thus, Drew did not

suffer a constitutional violation.  Id. at 7-9.  However, even if Drew's arrest had been constitutionally unlawful, the City posits that Drew has failed to sufficiently allege that the City and its Sheriff's Department, under the direction of Mike Williams, was deliberately indifferent in failing to train its officers regarding Florida Statutes section 766.032, or that the alleged failure to train was the cause of Drew's alleged constitutional violation.  Id. at 9-11.  Therefore, the City contends that Drew's claims against it must also be dismissed.

Drew challenges the City's arguments, asserting that his claim against the City is not grounded in a failure to train theory.  Plaintiff's Response at 13.  Rather, Drew argues that his alleged unlawful arrest occurred because of the City's "express policy that permits and even requires arrests that are actually forbidden by [Fla.] Section 766.032."  Id. Therefore, Drew asserts that his municipal liability claim against the City should not be dismissed.

IV.  **DISCUSSION**

"[S]ection 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law."  Brown v. City of Huntsville, Ala., 608 F.3d 724, 733 n.12 (11th Cir. 2010) (citation omitted); see 42 U.S.C. § 1983.  Thus, to state a claim for relief under § 1983, a plaintiff must sufficiently allege that he or she was "'deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.'"  See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276-77 (11th Cir. 2003) (quotation omitted).  Here, Drew asserts a violation of his rights under the Fourth Amendment,

specifically that the Defendants violated his Fourth Amendment right to be free from unreasonable searches and seizures.  See Amended Complaint at ¶ 39.[6]

### A.    Count I against Shouse – Fourth Amendment Violation for False Arrest

In Count I of his Amended Complaint, Drew alleges that Shouse violated his Fourth Amendment rights when she arrested him without a warrant for attempted murder.  Id. at ¶¶ 39-40.  In response, Shouse contends that she should be afforded qualified immunity because she had arguable probable cause to arrest Drew for shooting Davis.  Shouse Motion at 9-13.

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  As a result, this defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[7]  Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful."  Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., 268 F.3d 1014, 1031 n. 8 (11th Cir. 2001)).

---

[6] The Fourth Amendment applies to state and local governments pursuant to the Due Process Clause of the Fourteenth Amendment.  See Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 n.15 (11th Cir. 2010).
[7] In determining whether a defendant is entitled to qualified immunity, the court views the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then considers "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law."  Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000); Scott v. Harris, 550 U.S. 372, 381 n.8 (2007).

In order to be entitled to qualified immunity, the defendant must first establish that her conduct was within the scope of her discretionary authority. See Webster v. Beary, 228 Fed. Appx. 844, 848 (11th Cir. 2007) (per curiam); Lee, 284 F.3d at 1194. Here, neither party contends that Shouse was acting outside the scope of her discretionary authority when she arrested Drew.[8] Therefore, the burden shifts to Drew "to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194. To do so, Drew must establish two elements: (a) that the defendant violated a constitutional right, and (b) the right violated was clearly established. Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). The Court may consider these elements in whichever order it chooses, and qualified immunity will protect the defendant if the plaintiff fails to establish either element. Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009).

As noted, Drew asserts that Shouse violated his Fourth Amendment rights by arresting him without a warrant. Amended Complaint at ¶¶ 39-41. "An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim . . . ." Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010). Under both federal and Florida law,

> [f]or probable cause to exist, . . . an arrest must be objectively reasonable
> based on the totality of the circumstances. This standard is met when the
> facts and circumstances within the officer's knowledge, of which he or she
> has reasonably trustworthy information, would cause a prudent person to
> believe, under the circumstances shown, that the suspect has committed,
> is committing, or is about to commit an offense.

---

[8] "'A government official acts within [her] discretionary authority if the actions were (1) undertaken pursuant to the performance of [her] duties and (2) within the scope of [her] authority.'" Jones v. City of Atlanta, 192 Fed. Appx. 894, 897 (11th Cir. 2006) (per curiam) (quoting Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)).

Lee, 284 F.3d at 1195 (quotation and internal quotation marks and citation omitted). However, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Brown, 608 F.3d at 734. As such, the dispositive question for qualified immunity purposes in this action is whether Shouse had at least arguable probable cause to arrest Drew.[9] Id. "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest.'" Lee, 284 F.3d at 1195 (quotation omitted); see also Brown, 608 F.3d at 734. "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding

---

[9] In wrongful arrest cases, the "clearly established" prong of qualified immunity is framed as an "arguable probable cause" inquiry. See Poulakis v. Rogers, 341 Fed. Appx. 523, 526 (11th Cir. 2009); Case v. Eslinger, 555 F.3d 1317, 1327-28 (11th Cir. 2009) ("Absent evidence that a constitutional violation occurred, we need not consider whether the alleged violation was clearly established; that is, we need not consider whether [the officer] lacked even arguable probable cause."); see also Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001) (per curiam). In other words, "when an officer violates the Constitution because he lacked probable cause to make an arrest, the officer's conduct may still be insulated under the second prong of qualified immunity if he had 'arguable probable cause' to make the arrest." Id. The Eleventh Circuit explains that

> [a]n examination of arguable probable cause makes sense under the second prong because the second prong does not ask whether the Constitution was violated. Instead, it asks only whether a reasonable officer was given fair and sufficient notice that what he was doing was unlawful under the circumstances. Simply put, the only question we ask under [the] second prong is whether "[a] reasonable officer[ ] in the same circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest."

Id. at 527 n.2 (quoting Lee, 284 F.3d at 1195); see also Moran v. Cameron, 362 Fed. Appx. 88, 93 (11th Cir. 2010) (addressing the second prong of the Saucier test by asking whether the officer's arrest of the plaintiff "was clearly established as unconstitutional because it lacked arguable probable cause"); Eloy v. Guillot, 289 Fed. Appx, 339, 343 n.5 (11th Cir. 2008) ("The arguable probable cause standard applies in the 'clearly established law' prong of the qualified immunity analysis."); but see Poulakis, 341 Fed. Appx. at 534-35 (Quist, J., dissenting) (citing Skop v. City of Atlanta, Ga., 485 F.3d 1130 (11th Cir. 2007)); Hawthorne v. Sheriff of Broward Cnty., 212 Fed. Appx. 943, 946-47 (11th Cir. 2007) (holding that because the officer had arguable probable cause for the arrest, the plaintiff failed to show a constitutional violation and the court need not consider the "clearly established" prong of the qualified immunity analysis); Davis v. Williams, 451 F.3d 759, 764 n.8 (11th Cir. 2006) (characterizing the "arguable probable cause" inquiry as addressing the first step of the qualified immunity analysis because "there is no question that the second step-clearly established-is satisfied, as it is clearly established that an arrest made without probable cause violates the Fourth Amendment").

probable cause but does not shield officers who <u>unreasonably</u> conclude that probable cause exists." <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1137 (11th Cir. 2007).

"'The essence of qualified immunity analysis [as to arguable probable cause] is the public official's objective reasonableness, regardless of his underlying intent or motivation.' 'The standard is an objective one, and therefore does not include an inquiry in the officers' subjective intent or beliefs[,]'" which are irrelevant. <u>Rushing v. Parker</u>, 599 F.3d 1263, 1266 (11th Cir. 2010) (per curiam) (internal quotations omitted). Moreover, "[p]olice officers are not expected to be lawyers or prosecutors[,]" and "[a]rguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest[.]" <u>Scarbrough v. Myles</u>, 245 F.3d 1299, 1302-03 & n.8 (11th Cir. 2001) (per curiam) (citation omitted). The proper focus is on "whether [the arresting officer] violated clearly established law in making the arrest[] based on the objective factors that gave rise to [her] probable-cause determination and not whether the arrestees' actions actually constituted a crime." <u>Id.</u> at 1303 n.8. Thus, "what counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." <u>Jones v. Cannon</u>, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999) (collecting cases).

Notably, "[a]n arresting officer is required to conduct a reasonable investigation to establish probable cause." <u>Rankin v. Evans</u>, 133 F.3d 1425, 1435 (11th Cir. 1998). An officer may not "choose to ignore information that has been offered to him or her . . . [or] conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts . . . ." <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1229 (11th Cir. 2004). Indeed, "[a]

police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, . . . it is unclear whether a crime [has] even taken place." See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) (alterations added); see also Ahlers v. Schebil, 188 F.3d 365, 372 (6th Cir. 1999) ("[O]fficers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone."). Although officers "need not conduct a 'mini-trial' before making an arrest, . . . probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (internal citations omitted). However, "[a]n officer does not have to take 'every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person.'" See Williams v. City of Homestead, Fla., 206 Fed. Appx. 886, 888 (11th Cir. 2006) (quoting Tillman v. Coley, 886 F.2d 317, 321 (11th Cir. 1989)).

Moreover, "while a police officer should consider a suspect's explanation in evaluating the existence of probable cause, [the officer] 'is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.'" City of Homestead, 206 Fed. Appx. at 888-89 (quoting Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988)). Significantly, "in determining whether probable cause to arrest exists, an officer must consider all facts and circumstances within that officer's knowledge, including facts and circumstances conclusively establishing an affirmative defense." See Williams v. Sirmons, 307 Fed. Appx. 354, 359 (11th Cir. 2009). Indeed, officers are not permitted "to turn a blind eye to exculpatory

information that is available to them, and instead support their actions on selected facts they chose to focus upon." See Kingsland, 382 F.3d at 1228 (citing Sevigny v. Dicksey, 846 F.2d 953 (4th Cir. 1988)).

In this context, the Court further recognizes that "[g]enerally, in determining probable cause an arresting officer does not have to consider the validity of any possible defense." See Williams v. Sirmons, 307 Fed. Appx. 354, 358 (11th Cir. 2009). "An exception to the general rule exists, however, when the arresting officer actually has knowledge of facts and circumstances conclusively establishing an affirmative defense." Id. As such, "if an officer has knowledge of facts and circumstances which establish an affirmative defense, he or she lacks probable cause to arrest, even when the facts and circumstances establish that the person meets all elements of the offense." Id. at 359. Finally,

> [i]n determining whether an officer lacked arguable probable cause to justify an arrest – i.e., whether the right was clearly established at the time of the incident – under controlling law we turn to the precedent of the United States Supreme Court, the precedent of [the Eleventh Circuit Court of Appeals], and to the highest court of the relevant state in interpreting and applying the law in similar circumstances. [The Eleventh Circuit Court of Appeals] has said clearly, consistently, and on numerous occasions that we may only consider the precedent of these courts in determining whether the case law has "clearly established" a right for qualified immunity purposes . . . [T]here will be some cases where law enforcement officials will reasonably, but mistakenly conclude that probable cause is present, and, as the Supreme Court has instructed us, those officials should not be held personally liable.

Poulakis, 341 Fed. Appx. at 527–28 (citations omitted).

"[W]hether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." Brown, 608 F.3d at 735 (citations omitted). So long as the arresting officer had "arguable probable cause to arrest for any offense, qualified immunity will apply." See id. Here, in

contending that Shouse had arguable probable cause, the Defendants focus solely on the crime for which Shouse arrested Drew: attempted murder. Shouse Motion at 10-13; City Motion at 7–9. As such, the Court need only determine whether, based on the totality of the circumstances, Shouse had arguable probable cause to arrest Drew for that offense. Therefore, the question before the Court is whether Shouse had arguable probable cause to believe that Drew's use of deadly force against Davis was unlawful.[10]

Under Florida law, "the unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree." Fla. Stat. § 782.04(2). Florida law further provides that "[a] person who attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense, but fails in the perpetration . . . commits the offense of criminal attempt . . . ." Id. at § 777.04. Here, neither side disputes that Drew pulled a gun and shot Davis in the face. Based on these facts alone, the Defendants argue the matter should be conclusively resolved in their favor. Shouse had probable cause to arrest Drew because, in pulling his gun and shooting Davis in the

---

[10] Reagan v. Mallory, 429 Fed. Appx. 918, 922 (11th Cir. 2011), an unpublished Eleventh Circuit opinion, supports the Court's conclusion on this point. There, before determining whether the arresting officer was entitled to qualified immunity, the Eleventh Circuit Court of Appeals considered whether, based on the facts known to him, the officer had probable cause to believe the aggressor's use of force was not lawful and thus not subject to immunity. See id. at 920–23. The analysis followed by the Court in Reagan indicates that an officer needs to have at least arguable probable cause to believe that a suspect's use or threatened use of force was unlawful to be entitled to qualified immunity from a claim of false arrest. See id. at 922 ("There was ample probable cause establishing the prima facie existence of aggravated assault. . . . Thus, [the plaintiff's] case hinges on whether he is entitled to immunity pursuant to § 776.031."). Indeed, the Eleventh Circuit noted that, "[u]nder Florida law, law enforcement officers have a duty to assess the validity of [the immunity] defense …." Id. at 920 (citing Florida Statutes section 776.032(2) and emphasizing that an officer "may not arrest the person for using force unless [the officer] determines that there is probable cause that the force that was used was unlawful").

face, Drew attempted to unlawfully kill Davis. Shouse Motion at 6; City Motion at 7-9. Drew, conversely, asserts that any probable cause analysis must include an evaluation of whether Drew's shooting of Davis was a justified and lawful use of force. Drew Response at 6–7.

Importantly, Florida law defines murder as the "unlawful killing of a human being," Fla. Stat. § 782.04(2) (emphasis added), and provides that a law enforcement officer "may not arrest [a] person for using or threatening to use force unless [the officer] determines that there is probable cause that the force that was used or threatened was unlawful." Fla. Stat. § 776.032(2) (emphasis added). In this context, Florida law states that

> [a] person is justified in using or threatening to use deadly force if he . . . reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself . . . . A person who uses or threatens to use deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use deadly force is not engaged in a criminal activity and is in a place where he . . . has a right to be.

Id. at § 776.012(2). While some Florida courts have characterized justifiable use of force as an affirmative defense, see, e.g., Mosansky v. State, 33 So. 3d 756, 758 (Fla. 1st DCA 2010), the statutory language itself indicates that it is something more than that.[11] Indeed, Florida Statutes section 776.032(2) affirmatively requires an arresting officer to determine that he or she has probable cause to conclude that a suspect's use of force was unlawful

---

[11] Indeed, the Florida Supreme Court has recently recognized "that the Stand Your Ground law is intended to be an immunity from prosecution as opposed to just an affirmative defense." Bretherick v. State, 170 So. 3d 766, 779 (Fla. 2015) (emphasis added); see also Rosario v. State, 165 So. 3d 852, 854 (Fla. 1st DCA 2015) ("Florida's Stand Your Ground law is intended to establish a true immunity from charges and does not exist as merely an affirmative defense."). Bretherick and Rosario specifically discussed section 776.032(1) rather than section 776.032(2). Nevertheless, they are instructive regarding the Florida courts' interpretation of section 776.032. See Kumar v. Patel, 227 So.3d 557, 559 (Fla. 2017) (noting court's role in developing procedural mechanisms associated with the statute).

before making an arrest based on that use of force.  Fla. Stat. § 776.032(2).  Thus, the Florida Legislature has made a finding of probable cause as to unlawfulness a necessary determination before making an arrest for an offense involving the use or threatened use of force. Therefore, in order to determine whether Shouse is entitled to qualified immunity, the Court must evaluate whether the alleged facts support a finding that she had at least arguable probable cause to believe that Drew's use of deadly force against Davis was unlawful.

The Court, taking the facts alleged in Drew's Amended Complaint as true, and having reviewed the video recording, determines that Drew fails to allege a plausible claim that Shouse lacked arguable probable cause to conclude that Drew's shooting of Davis was unlawful.  See Iqbal, 556 U.S. at 678.  More specifically, Drew's allegations, and the accompanying video recording, do not plausibly suggest that Shouse possessed "knowledge of facts or circumstances conclusively establishing" that Drew was justified shooting Davis in the face.  Williams, 307 Fed. Appx. at 358.

Here, Drew alleges that Davis "physically, repeatedly, and forcefully" struck Drew "with closed fists [on] his face and body."  Amended Complaint at ¶ 14.  In response, Drew "pulled a gun that he had been possessing in a side-holster and fired one (1) shot into Mr. Davis' face."  Id. at ¶ 19.  Based on these initial facts alone, a reasonable officer in the same circumstance as Shouse could have concluded that probable cause existed to arrest Drew for attempted murder.  When Drew shot Davis in the face, Drew engaged in an "imminently dangerous [act] to another, and evinced a depraved mind regardless of human life . . . ."  Fla. Stat. § 782.04(2); see also § 777.04 (defining attempt crimes).

However, Shouse was also required to extend her investigation of the shooting incident beyond merely establishing that Drew's actions met "all the elements of the offense." Williams, 307 Fed. Appx. at 358. Rather, the law compelled her to conduct a reasonable investigation, and not to ignore or close her eyes to facts that would help clarify the circumstances of an arrest. BeVier, 806 F.2d at 128. In this regard, Shouse was required take into account Drew's proffered explanation or defense, but she was not obliged to give it credence. City of Homestead, 206 Fed. Appx. at 888-89. If Shouse had knowledge of facts or circumstances conclusively establishing Drew could claim immunity under Florida law, she would lack "probable cause to arrest [Drew], even when the facts and circumstances establish" that Drew's actions otherwise met all the elements for attempted murder. Williams, 307 Fed. Appx. at 358.

The facts detailed in Drew's Amended Complaint do not sufficiently allege that Shouse closed her eyes to facts that would help her clarify whether Drew could claim immunity under Florida Statutes sections 776.012(2) and 766.032. BeVier, 806 F.2d at 128. Nor do the alleged facts plausibly assert that Shouse possessed "knowledge of facts or circumstances conclusively establishing" that Drew's use of deadly force was not unlawful. Williams, 307 Fed. Appx. at 358. Rather, a reasonable officer in the same circumstance as Shouse could have believed that probable cause existed to establish that Drew's use of deadly force was unlawful, and therefore his arrest without a warrant for attempted murder was within the bounds of the Constitution.

Notably, while the facts are viewed in the light most favorable to Drew, it is the facts known to Shouse that matter. Drew alleges that Shouse arrived at his residence after Davis had been transported to a local hospital to receive emergency medical care.

Amended Complaint at ¶ 22.  While at Drew's home, Shouse "made contact with several witnesses," as well as with Drew, who asserted that Drew acted in self-defense. Amended Complaint at ¶¶ 23, 25.  Later, upon learning from Drew that a video recording had captured the entire shooting incident, Shouse retrieved and reviewed the video.  Id. at ¶¶ 27-28.  Hence, to no measure did Shouse ignore facts that could help her clarify the circumstances surrounding the shooting incident between Drew and Davis.  In viewing the video recording, Shouse considered Drew's assertion that he acted in self-defense. However, despite Drew's claim that the video conclusively establishes that he lawfully shot Davis in self-defense, the Court finds that Shouse could reasonably have concluded otherwise.

First, the video recording does not provide any audio.  Without question, the video depicts a rapidly intensifying conflict between Drew and Davis, beginning first with apparent heated words, then escalating to Davis striking Drew, and finally culminating with Drew shooting Davis in the face.  However, without the benefit of audio, an officer would be unable to gauge the tone and tenor of the verbal conflict between the men immediately preceding Davis' blows to Drew.  In the absence of any audio, and not having been able to interview Davis because he had already been taken to the hospital, a reasonable officer in the same circumstance as Shouse could have concluded that she lacked sufficient facts to conclusively determine that Drew was justified in shooting Davis. Knowing that Drew intentionally shot Davis, not being able to determine from the silent video what transpired between the two immediately before the violence began, and not being able to speak to the victim, Davis, to hear his version of the events, Shouse certainly had at least arguable probable cause to believe that Drew's use of deadly force was

unlawful.  Second, a reasonable officer in the same circumstance as Shouse could have concluded that even if Drew was justified in drawing his gun and threatening Davis with the use of deadly force as a means to stop Davis' assault, when Drew shot Davis in the face, his actual use of deadly force, as opposed to the mere threat of deadly force, was unlawful.  See Fla. Stat. § 776.032(2) ("A law enforcement officer may use standard procedures for investigating the use or threatened use of force . . . but the agency may not arrest the person for using or threatening to use force unless it determines that there is probable cause that the force that was used or threatened was unlawful.").  In either event, viewing the facts in the light most favorable to Drew, Shouse had at least arguable probable cause to believe that Drew's use of deadly force was unlawful and warranted his arrest.

Finally, in the context of this qualified immunity analysis, the Court considers whether it was clearly established that Drew had the right to be free from arrest because his shooting of Davis was justified.  In doing so, the Court may "turn to the precedent of the United States Supreme Court, the precedent of [the Eleventh Circuit], and to the highest court of the relevant state in interpreting and applying the law in similar circumstances."  Poulakis, 341 Fed. Appx. at 527–28.  However, no cases from these courts present facts that sufficiently mirror those presented in the instant case.  In the absence of such authority, it is not clearly established that an officer, who arrests a suspect without a warrant for shooting another in the face following a verbal and physical assault, violates the suspect's Fourth Amendment rights, when the suspect claims immunity from arrest pursuant to Florida Statutes section 766.032.  See e.g., Sanders v. City of Dothan, 409 Fed. Appx. 285, 209 (11th Cir. 2011) ("There is no case law with facts

indistinguishable from the present case clearly establishing a constitutional right not to be tasered in these circumstances."); <u>Gray ex rel. Alexander v. Bostic</u>, 458 F.3d 1295, 1309 n.9 (11th Cir. 2006) (lack of case law on specific factual issue indicates law not clearly established).

Moreover, the limited Florida Supreme Court precedent which does exist supports a finding that Shouse did not violate Drew's Fourth Amendment rights when she arrested him without a warrant for attempted murder. In <u>Kumar v. Patel</u>, the Florida Supreme Court examined whether an immunity finding in a criminal action under Florida Statutes section 776.032 was binding in a subsequent civil proceeding. <u>Kumar</u>, 227 So.3d 557, 558 (Fla. 2017). There, the Florida Supreme Court recognized that while Florida law directs that individuals claiming protection under section 776.032 should be immune from arrest, detention, and prosecution,

> in many situations, it would be impossible for law enforcement to secure a judicial immunity determination prior to arresting an individual suspected of killing or causing bodily harm to another (or attempting to do so). The law is clear that we expect officers to temporarily detain a person encountered under circumstances creating a reasonable suspicion of criminal activity. § 901.151, Fla. Stat. (2017). Then, if there is probable cause to believe that the person committed a felony, law enforcement is authorized to immediately effectuate the arrest, under section 901.15, Florida Statutes (2017), and should clearly do so when there is probable cause to believe that a person has committed a serious crime of violence against another. <u>Cf.</u> § 907.041(4)(c)5., Fla. Stat. (2017) (authorizing pretrial detention by court order when a suspect poses a risk of physical harm to the community). Probable cause to arrest for a crime of violence would include probable cause to believe that the suspect was not acting in self-defense; and, suspects will often claim self-defense even when the facts would not appear to support such a claim. This means that in most potential self-defense cases, a post-arrest and post-charging immunity determination, made when a defendant's counsel requests that determination, will be the best that we can do—procedurally—considering the well-established body of law detailing the responsibilities of law enforcement officers, prosecutors, and judges.

Id. at 559-560.  Certainly, in <u>Kumar</u> the Florida Supreme Court recognized that section 776.032 commands that an individual claiming immunity under the statute should be free from arrest, detention, and prosecution.  <u>Id.</u> at 559.  However, the Florida Supreme Court also acknowledged that in many situations an officer may have enough information to lead her to reasonably conclude a crime has been committed, but not enough information to conclusively determine that the criminal suspect was acting in self-defense.  In such settings, Florida law guides that the officer should arrest the suspect, and an immunity determination would be made later in the judicial process.  <u>Kumar</u>, 227 So.3d at 560.  Hence, while <u>Kumar</u> was decided four years after the events in the present case, Shouse's actions were in full accord with the Florida Supreme Court's judicial development of how law enforcement officials should implement Florida Statutes section 776.032.

For all of the foregoing reasons, the Court determines that Drew's Amended Complaint, in alleging that Shouse violated Drew's Fourth Amendment rights by arresting him without a warrant and in an apparent disregard of his claim of justified self-defense under Florida law, fails to state a claim for relief that is plausible on its face.  <u>Iqbal</u>, 556 U.S. at 678.  Therefore, Count I is due to be dismissed.

**B.    Count II – Municipal Liability**

In Count II of his Amended Complaint, Drew alleges that Mike Williams, in his official capacity as Sheriff of Duval County, Florida, failed to change departmental polices or train his officers regarding the proper application of Florida Statutes section 766.032, and that this failure was the direct and proximate cause of Drew's warrantless arrest and the violation of his Fourth Amendment rights.  <u>See</u> Amended Complaint at ¶ 55.  In

response, the City asserts that even if Shouse did lack probable cause to arrest Drew, Drew has not alleged facts supporting a plausible claim that the City was deliberately indifferent in failing to train its officers regarding the proper application of section 766.032. City Motion at 9-11.

A municipality may be liable in a § 1983 action "only where the municipality <u>itself</u> causes the constitutional violation at issue." <u>Cook ex. rel. Estate of Tessier v. Sheriff of Monroe County</u>, 402 F.3d 1092, 1115 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the municipality was the "moving force" behind the alleged constitutional deprivation. <u>See</u> <u>Monell v. Dept. of Soc. Servs. of City of New York</u>, 436 U.S. 658, 693-94 (1978). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the <u>municipality</u> from acts of <u>employees</u> of the municipality, and thereby make clear that municipal liability is limited to action <u>for which the municipality is actually responsible</u>.'" <u>Grech v. Clayton County</u>, 335 F.3d 1326, 1329 n.5 (11th Cir. 2003) (en banc) (quotation omitted). Indeed, municipal liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (<u>quoting</u> <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 483-84 (1986)). A municipality will rarely have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the municipality has a custom or practice of permitting the violation. <u>See</u> <u>Grech</u>, 335

F.3d at 1330; <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." <u>Sewell</u>, 117 F.3d at 489.

In some circumstances, "the failure to provide proper training may fairly be said to represent a policy for which [the county] may be held liable if it actually causes injury." <u>City of Canton</u>, 489 U.S. at 390. Failure to train can lead to municipal liability "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants [such that the failure to train] can be properly thought of as a city 'policy or custom' that is actionable under § 1983." <u>Id.</u> at 388-89 (alteration added). Thus, in order to assert such a claim, a plaintiff must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998). The Eleventh Circuit has repeatedly held that "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise." <u>Id.</u> at 1351. Indeed, "the need for such training must be plainly obvious to [County] decisionmakers," such as where there is "evidence of a history of widespread prior abuse." <u>Wright v. Sheppard</u>, 919 F.2d 665, 674 (11th Cir. 1990) (alteration added); <u>see</u> <u>also</u> <u>Rocker v. City of Ocala, Fla.</u>, No. 09-13827, 2009 WL 4365226, at *2 (11th Cir. Dec. 3, 2009) (per curiam) (unpublished).

In his Amended Complaint, Drew asserts that despite Florida's enactment of section 766.032,

> the Jacksonville Sheriff's Office has failed to change their policies, procedures, and general orders with respect to the use of force

investigations. To date, the Jacksonville Sheriff's Office, led by Mike Williams, permits its law enforcement officers to effect arrests of suspects without first establishing probable cause to believe that a use of force was not justified [under Florida law.] In the twelve years since Section 766.032 was enacted, the only document concerning Section 766.032 that was authored and distributed to JSO employees was a "Bulletin" that merely quoted the language of the statute. Otherwise, the JSO has not trained, educated, or instructed its law enforcement officers, including . . . Shouse, about their affirmative duty under Section 776.032. The JSO's policies, protocols, and general orders, which permit arrests in violation of Section 776.032, were the moving force and true cause of [Drew's] arrest without probable cause.

Id. at ¶¶ 49-53. The City interprets this language to suggest that in seeking to hold the City liable for Shouse's allegedly unlawful arrest of Drew, Drew is asserting municipal liability under a "failure to train" theory. City Motion at 10. Drew challenges the City's construction of his claim, and asserts that he has not alleged a "failure to train" claim, but rather, that he has "clearly . . . alleged that for the last 12 years, [the] City maintained an express policy that permits and even requires arrests that are actually forbidden by Section 776.032." Plaintiff's Response at 13. The Court disagrees.

While Drew may have attempted to craft some form of an "official policy and custom" claim against the City, Monell, 436 U.S. at 693-94, nothing in his Amended Complaint alleges or implies that the City maintained any type of "express policy that permits and even requires arrests that are actually forbidden by Section 766.032." Plaintiff's Response at 13. Rather, Drew alleges that JSO failed to update its policies and procedures, that it failed to train or educate its officers regarding Florida Statutes section 776.032, and that it permits its officers to take action in contradiction to the statute. Amended Complaint at ¶¶ 49-53. However, nowhere within Drew's litany of allegations against Williams, the JSO, or the City, does he present facts suggesting that the City has an "express policy" permitting or requiring officers to arrest individuals in violation of

section 776.032. Therefore, the Court rejects Drew's argument that he has alleged a claim of municipal liability based on a <u>Monell</u> "official policy and custom" rather than a <u>City of Canton</u> "failure to train" claim.

Nor is the Court convinced that Drew has sufficiently pled that the City, in its alleged failure to change its policies and train its officers regarding Florida Statutes section 776.032, was deliberately indifferent to a need to train. <u>See</u> <u>Gold</u>, 151 F.3d at 1350; <u>Wright</u>, 919 F.2d at 674. Drew does allege that the City failed to train or educate its officers regarding section 776.032. However, nothing within the Amended Complaint suggests that the City was presented with a plainly obvious need to train its officers and that it nonetheless made a deliberate choice not to provide any training to its police force. <u>See</u> <u>Gold</u>, 151 F.3d at 1350; <u>Wright</u>, 919 F.2d at 674. Without some allegation that the City's failure to train its officers was rooted in a deliberate indifference to the need for such training, Drew's bare conclusory allegations of the City's failure to train are insufficient to plead municipal liability against Williams, in his official capacity as Sheriff of Duval County. Accordingly, Count II is also due to be dismissed.

In light of the foregoing, it is **ORDERED:**

1) Defendant Jessica N. Shouse's Motion to Dismiss and Supporting Memorandum of Law (Doc. 19) is **GRANTED**, wherein Count I is **DISMISSED** with prejudice.

2) Defendant Mike Williams,' in his official capacity as Sheriff of Duval County, Florida, Motion to Dismiss Amended Complaint and Supporting Memorandum of Law (Doc. 20) is **GRANTED**, wherein Count II is **DISMISSED** with prejudice.

3) The Clerk of the Court is directed to terminate any pending motions and close the case.

**DONE AND ORDERED** in Jacksonville, Florida, this 16th day of August, 2018.

MARCIA MORALES HOWARD
United States District Judge

lc26
Copies to:
Counsel of Record